# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMANA INC.,<br>　　　Plaintiff,<br><br>　　　　　　　v.<br><br>MALLINCKRODT ARD LLC<br>(f/k/a Mallinckrodt ARD Inc., f/k/a<br>Questcor Pharmaceuticals, Inc.),<br>　　　Defendant. | CV 19-06926 DSF (MRW)<br><br>Order GRANTING in part and<br>DENYING in part Defendant's<br>Motion to Dismiss and<br>DENYING Defendant's Motion<br>to Strike (Dkt. 47) |

　　　Defendant Mallinckrodt ARD LLC moves to dismiss Plaintiff Humana Inc.'s First Amended Complaint (FAC) in its entirety.  Dkt. 47-1 (Mot.).  Plaintiff opposes the Motion.  Dkt. 51 (Opp'n).  The Court deems this matter appropriate for decision without oral argument.  <u>See</u> Fed. R. Civ. P. 78; Local Rule 7-15.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

　　　Defendant produces H.P. Acthar Gel (Acthar), a drug that was invented in 1948 and first approved by the FDA in 1952.  Dkt. 46 (FAC) ¶¶ 2, 4, 42, 44.  Plaintiff operates or administers Medicare Part D plans on behalf of federal and state governments and provides coverage for prescription drugs, including Acthar, through other plans.  <u>Id.</u> ¶ 39.  Acthar is an adrenocorticotropic hormone (ACTH) used as an anti-inflammatory.  <u>Id.</u> ¶ 41.  Acthar is the only ACTH drug approved for sale in the United States.  <u>Id.</u> ¶ 57.  Another ACTH drug, Synacthen, is approved for sale outside of the United States.  <u>Id.</u> ¶ 62.  Acthar is approved to treat exacerbations of multiple sclerosis (MS) as well as other diseases and disorders.  <u>Id.</u> ¶ 41.  However, for many of these

conditions, Acthar is not the "first-line treatment." Id. ¶ 46. Cheaper non-ACTH drugs are used to treat the same indications. Id. ¶¶ 57, 84. In 2010, the FDA approved Acthar for infantile spasms, the only condition for which Acthar is the "first-line treatment." Id. ¶ 48. The only other FDA-approved drug for infantile spasms costs four times less than Acthar, although it is prescribed for a smaller set of patients. Id. ¶ 58.

Until 2001, when Defendant's predecessor, Questcor, acquired worldwide rights to sell and manufacture Acthar for $100,000, plus royalties, Acthar was priced competitively with other anti-inflammatory drugs. Id. ¶ 49. At that time, because Acthar was expensive to produce and not the first-line treatment for most conditions, the prior manufacturer considered discontinuing production. Id. However, as soon as Questcor acquired the rights to sell Acthar, it increased the price from approximately $40 per vial to nearly $750 per vial. Id. ¶ 51. On August 27, 2007, Questcor further increased the price from $1,650 to $23,269 per vial. Id. ¶ 52. By 2018, the price has been further increased to $38,892. Id. ¶ 53. Between 2011 and 2015, net sales of Acthar increased from $218 million to more than $1 billion, and Medicare spending on Acthar increased from $50 million to $500 million. Id. ¶¶ 54-55. Humana itself paid more than $700 million for Acthar since 2001. See id. ¶ 78.

In June 2007, Defendant "vertically integrated its sales by distributing Acthar exclusively through the specialty pharmacy CuraScript," a subsidiary of Express Scripts. Id. ¶¶ 11, 24-25. CuraScript "is paid a fixed fee for each vial of Acthar" and has the right to return to Defendant any inventory "which goes unsold before its expiration date. Id. ¶ 76.

In 2010, Questcor established an MS Acute Exacerbation Fund (MS Fund) with Chronic Disease Fund, Inc. (CDF), a Texas-based charity. Id. ¶¶ 29, 88-89. The MS Fund helped patients with government insurance, such as Medicare, with co-pays for Acthar. Id. ¶ 89. Although the donation agreement stated that the donated funds were generally for the treatment of patients with acute exacerbations of

MS, in reality it did not provide co-pay assistance to purchase any other drugs.  Id.  In 2011, Questcor established a Lupus Exacerbation Fund (Lupus Fund) that was purportedly to provide co-pay assistance for "any medically appropriate therapy," but in fact was used only to provide assistance for Acthar.  Id. ¶ 91.  In 2012, Questcor created a similar fund for rheumatoid arthritis (RA Fund).  Id. ¶ 92.  Between 2010 and 2013, Acthar sales for MS treatment nearly quadrupled.  Id. ¶ 99.

Between 2013 and 2016, Questcor and then Defendant paid doctors nearly $27.5 million purportedly for "consulting, promotional speaking, and other services related to Acthar."  Id. ¶ 107.  About 35% of specialists receive payments from drug companies for similar services.  Id. ¶ 106.  Many of the doctors who prescribed Acthar the most were those who received substantial fees from Defendant.  Id. ¶¶ 107-108.

In late 2012 and early 2013, Novartis, the company that manufactured Synacthen abroad, sought bids from companies who wanted to acquire the rights to seek FDA approval and sell Synacthen in the United States.  Id. ¶¶ 65-68.  Questcor and three other companies submitted serious bids.  Id.  The three other companies intended to develop Synacthen to compete with Acthar; Questcor had "inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer."  Id.¶ 68.  However, Questcor's bid was the highest, at a minimum of $135 million.  Id. ¶¶ 69-70.  However, neither Questcor nor Defendant "made more than superficial efforts to pursue commercialization of Synacthen . . . to protect Acthar monopoly pricing."  Id. ¶ 73.  In July 2017, the FTC approved a sublicense granting another company the rights to develop and market Synacthen in the United States.  Id. ¶ 74.

## II.  LEGAL STANDARD

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted.  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual

allegations contained in the complaint." <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557) (alteration in original) (citation omitted).  A complaint must "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570.  This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.  There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted.  Fed. R. Civ. P. 15(a).

## III. DISCUSSION

Plaintiff brings claims against Defendant for violations of federal and state antitrust laws, the RICO Act, state unfair competition laws, consumer fraud and deceptive trade practice laws, and insurance fraud laws, as well as tortious interference with contractual relations, and unjust enrichment.

### A.     Antitrust Claims (Counts One through Three)

Plaintiff alleges that Defendant has monopoly power in the market for "ACTH drugs in the United States" and that Questcor's acquisition of the rights to develop and market Synacthen in the United States "restrained trade" in the relevant market and "eliminated [a] potential competitive threat" in order to "maintain its monopoly" so it can "stabilize or raise the price of Acthar to a higher level" than in a competitive market.  FAC ¶¶ 131-133, 137-139.  This conduct purportedly violates Sections 1 and 2 of the Sherman Antitrust Act and corresponding state antitrust laws.

"In order to state a Section 1 claim . . . plaintiffs must plead facts which, if true, will prove '(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition'" and "(4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'"  Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (first quoting Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1046 (9th Cir. 2008); then quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)).  Section 2 "targets 'the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 448 (2009) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570 (1966)).  "Simply possessing monopoly power and charging monopoly prices does not violate § 2."  Id. at 447-48.

Both Section 1 and Section 2 claims depend on whether Plaintiff has sufficiently alleged Defendant has market power in a relevant antitrust market.  Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to" both

Section 1 and Section 2 claims and plaintiff's "market allegations are either sufficient or insufficient for all [antitrust] claims."). "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Id. at 1045. One such fatal defect is the failure of the alleged market to "encompass . . . all economic substitutes for the product." Id.

Plaintiff alleges that the relevant market is the market for "the sale of ACTH drugs in the United States." FAC ¶¶ 131 (Section 2), 138 (Section 1). Plaintiff further alleges that Defendant's product, Acthar, "represents 100% of th[at] market." Id. ¶ 57. Defendant contends that this alleged market fails to include "all economic substitutes for the product," including non-ACTH drugs. Mot. at 7 (quoting Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018)). The Court agrees. Not only has Plaintiff failed to allege that non-ACTH drugs do not compete with ACTH drugs, but Plaintiff has specifically alleged such competition. See, e.g., FAC ¶ 6 ("The advent of these safe, cheap alternative treatments in pill form reduced the need for an injectable drug derived from the pituitary gland of pigs"); id. ("But other than [infantile spasms] and a handful of similarly rare conditions, Acthar is . . . either a drug of last resort or not known to be clinically effective"); id. ¶ 13 ("doctors would not otherwise be inclined to prescribe what for most purposes is an antiquated and expensive drug that requires refrigeration and injection when cheaper, more effective pills and remedies were available"); id. ¶ 43 (Describing the development of "corticosteroids, a class of steroids that can also be used to fight inflammation" and "ibuprofen and certain over-the-counter NSAIDs in form that are also used to combat inflammation"); id. ¶ 46 ("For many of [the] conditions [for which Acthar is approved for treatment], Acthar is not considered the first-line treatment" and there "remains a lack of evidence to support the use of Acthar for most indications"); id. ¶ 47 ("For most indications, there is also a lack of evidence to support Acthar's use over lower-cost synthetic corticosteroids"); id. ¶ 49 (Acthar was "expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective

than simpler, cheaper, and more widely available drugs"); id. ¶ 57 ("Acthar is priced substantially higher than non-ACTH drugs used to treat the same indications"); id. ¶ 58 (describing Sabril, "the only other FDA-approved drug for the treatment of infantile spasms"); id. ¶ 84 ("Questcor knew that it might have priced itself out of the MS market because Acthar had many cheaper, effective competitors in that market"); id. ¶ 147 ("Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment."); id. ¶ 151 ("Mallinckrodt has asserted control over the Acthar Enterprise by issuing payments to doctors who prescribed Acthar as treatment for conditions for which more affordable alternative treatments were readily available.").[1]

The product market must include all drugs that are reasonably interchangeable.  See Hicks, 897 F.3d at 1120 ("Economic substitutes have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product"); see also Kaiser Found. v. Abbott Labs., No. CV 02-2443-JFW (FMOx), 2009 WL 3877513, at *8 (C.D. Cal. Oct. 8, 2009) (granting summary judgment where the proposed product market "excluded other alpha-blockers," which are "reasonably interchangeable" with defendant's drug); Bayer Schering Pharma AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) (alleged product market is implausible where complaint fails to allege that "there is no combination of drugs that can serve as a functional substitute" to drugs in the proposed market). Plaintiff has failed to allege sufficiently that non-ACTH drugs are not reasonably interchangeable with ACTH drugs.[2]

---

[1] Plaintiff's conclusory allegation that there is an "absence of competition" including a "lower-cost substitute" because of "the unavailability of Synacthen," FAC ¶ 59, is belied by all of these other paragraphs describing a number of lower-cost substitutes.

[2] To the extent Plaintiff contends that lower-cost competitors are not in the relevant product market because they are not identical to Acthar, see FAC ¶ 58 (Sabril "has a different molecular structure, works differently, and is

In defense of its proposed market, Plaintiff argues that an "economic definition of a 'market,'" rather than a "medical" one should apply. Opp'n at 6. However, Plaintiff does not explain the effect of using an "economic definition" rather than a "medical" one. Plaintiff's citation to <u>Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.</u>, 924 F.2d 1484 (9th Cir. 1991) does not provide any additional clarity. In <u>Morgan</u>, the plaintiff "contend[ed] that the relevant market [wa]s 'referrals' to Tucson non[-]university medical radiologists." <u>Id.</u> at 1489. On summary judgment, however, the plaintiff failed to include evidence that providers of radiologists' services outside of the definition (university radiologists, osteopathic radiologists, or non-radiologist physicians) could not compete with providers covered by the definition. <u>Id.</u> The Ninth Circuit held that the proposed product market was too narrow because it improperly defined the market by "the producers' institutional associations rather than by the products' characteristics." <u>Id.</u> The court said nothing about a "medical" definition versus an "economic" one. As Defendant points out, in addressing the geographic market, as opposed to the product market, the court did note that it would "give little weight" to the doctors' "conclusory assertion[s]" that the "relevant geographic market is Tucson" because there was "no evidence that [they] were experts qualified to opine on a highly

---

prescribed for a smaller set of patients than Acthar" and Rituxan, a drug used to treat severe idiopathic membranous nephropathy, "operate[s] differently than Acthar does"), it is wrong. <u>See</u> <u>Hicks</u>, 897 F.3d at 1122 ("claims of increased effectiveness" of products in the proposed submarket does not "place" those products "in a distinct market"); <u>cf.</u> <u>United States v. Cont'l Can Co.</u>, 378 U.S. 441, 450, 457 (1964) (in discussing a product market for a claim under section 7 of the Clayton Act, noting that although "glass and metal containers have different characteristics which may disqualify one or the other, at least in their present form, from this or that particular use . . . interindustry competition between glass and metal containers is sufficient to warrant treating as a relevant product market the combined glass and metal container industries and all end uses for which they compete"). Plaintiff also concedes this point. <u>See</u> Opp'n at 6-7 n.4 ("products need not be physically identical in order to be in the same relevant market").

technical economic question." <u>Id.</u> at 1490.  This does not mean testimony on which doctors are qualified to opine, namely, what types of drugs are used to treat certain conditions, should not be considered. Nothing in <u>Morgan</u> indicates that medical substitutes are somehow not relevant to the determination of a drug product market.  In fact, it holds the contrary to be true.  <u>Id.</u> at 1489 (product market insufficient where it "exclude[s] University and osteopathic radiologists' services" without "[]sufficient evidence for a jury to conclude that University and osteopathic radiologists cannot compete with private medical radiologists").

To further support its argument, Plaintiff cites to a district court case denying a motion to dismiss Sherman Act claims brought against Defendant relying on the same proposed product market.  Opp'n at 7 (citing <u>City of Rockford v. Mallinckrodt ARD, Inc.</u>, 360 F. Supp. 3d 730 (N.D. Ill. 2019), <u>reconsideration denied,</u> No. 17 C 50107, 2019 WL 2763181 (N.D. Ill. May 3, 2019)).  The Court is not bound to follow the conclusions reached by another district court.  Further, in that case, plaintiffs alleged that "[b]y 2013, the only significant alternative to Acthar was Synacthen" and "Acthar was and continues to be the only viable product in ***the market for infantile spasms and certain other conditions***."  <u>City of Rockford</u>, 360 F. Supp. 3d at 745 (emphasis added).  No such allegations appear here.  Moreover, the court in <u>City of Rockford</u> simply assumed that the ACTH drug market was an appropriate product market and did not undertake an analysis of whether the plaintiff's alleged product market was facially sustainable.[3]

---

[3] The FAC also refers to Defendant's settlement with the FTC relating to its acquisition of the rights to Synacthen that required Defendant to "grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC."  FAC ¶ 74.  This does not save Plaintiff's complaint from the deficiencies in its alleged product market (and, if anything, highlights the flaws in a market definition untethered to drugs that are reasonably interchangeable for a given condition).  And while "[t]he FTC settlement is not admissible to establish liability," the FAC's reference

Plaintiff also contends that because Defendant concedes that "[r]ather than pricing this hard-to-manufacture drug to compete with low-cost alternatives for many common types of inflammation, Questcor legitimately could choose an 'orphan drug' pricing strategy (one for a low-volume, high-cost drug to treat rare and catastrophic diseases) to ensure the viability of the product," Mot. at 5, it somehow admitted Plaintiff's market definition, Opp'n at 7.  However, one does not follow from the other.  Defendant merely states that it chose to raise its price and focus on "rare and catastrophic diseases" instead of "common types of inflammation." Mot. at 5.  This says nothing about an ACTH market or reasonable substitutes for Acthar.

Plaintiff next contends that "there is nothing inconsistent or implausible about Acthar competing in more than one kind of market." Opp'n at 7.  This is certainly true and is undisputed by Defendant.  <u>See</u> Reply at 3.  But that there is a broad market for drugs, and submarkets for certain indications, does not establish a product market for ACTH drugs.[4]  "To plead an antitrust claim based on a submarket, 'the

_____

to it is not a "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Defendant's motion to strike, Mot. at 2, 10, is DENIED.

[4] The FTC amicus curiae brief cited by Plaintiff, Opp'n at 7, does not compel a different conclusion.  In the FTC's brief, it argued that "when multiple types of anticompetitive harm are alleged (as here), multiple [product] markets may be relevant." <u>Staley v. Gilead Sciences, Inc.</u>, No. 3:19-cv-02573-EMC (N.D. Cal.), Dkt. 180-1 at 2.  Specifically, because the complaint alleged two types of harm (preventing competition from generics and reducing competition among branded HIV medications), "the case may implicate multiple relevant markets." <u>Id.</u> at 1, 10.  However, the FTC did not take a "position on whether the complaint contain[ed] sufficient facts supporting the alleged product markets." <u>Id.</u> at 11.  It merely noted that the fact that products "compete[] to some degree in broader spheres as well . . . d[oes] not preclude defining more narrow relevant antitrust markets when assessing the specific alleged anticompetitive effects at issue." <u>Id.</u> at 5.  For example, the FTC noted that "the relevant market might consist of an entire therapeutic class of drugs when the anticompetitive effects are likely to manifest among that entire class, such as in a merger between two branded

plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market.'" <u>Hicks</u>, 897 F.3d at 1121. A plaintiff can do so by alleging "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." <u>Id.</u> (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962)). Here, the FAC contains no allegations tending to show these factors indicate an ACTH submarket, with the possible exception of distinct prices. And to the contrary, as explained above, the FAC contains allegations tending to show that other drugs have similar characteristics (<u>e.g.</u>, anti-inflammation), similar uses (<u>e.g.</u>, MS, Lupus, rheumatoid arthritis), similar customers (<u>e.g.</u>, Medicare recipients with certain conditions), and even sensitivity to price change (i.e. the purported impetus for the alleged bribes and co-pay funds), <u>see</u> FAC ¶ 96 ("Questcor conducted research and discovered that price was an obstacle to more prescriptions . . . ."). Therefore, Plaintiff's antitrust claims fail not because Acthar cannot be a participant in multiple markets (it can), but because Plaintiff has failed to plead sufficient facts to support an ACTH market in particular.

Plaintiff additionally argues that Defendant was able to raise its prices exponentially "without losing sales []to corticosteroids or any other non-ACTH drug." Opp'n at 6 (citing FAC ¶¶ 2, 8, 51–55, 72). However, none of those cited paragraphs contains allegations supporting such a claim. That "Acthar net sales increased," "Medicare spending on Acthar increased," and "the number of Medicare Part D claims" increased, <u>see id.</u> ¶¶ 54-55, does not show that Defendant did

---

manufacturers," while "[i]n other circumstances, the relevant market might be limited to only a subset of a therapeutic class" or even to "the brand and generic versions of that product." <u>Id.</u> at 8-9. However, that a more specific market might exist does not mean that any proposed "submarket" is sufficient. A complaint must still "plead sufficient facts to support [the] alleged relevant markets." <u>See id.</u> at 10. Plaintiff has failed to do so here.

not lose sales to its competitors.  Further, the largest increase (1300%) occurred in 2007, see id. ¶ 52, years before Defendant acquired the rights to Synacthen and before Acthar was approved for infantile spasms, the indication for which it is the first-line treatment.  And importantly, Plaintiff alleges that its sales increased in large part during the relevant time period because of Defendant's illegal actions to increase demand, not because of its market power in the ACTH market.  See, e.g., FAC ¶ 99 (The co-pay funds "worked as planned" as "MS sales nearly quadrupled between the third quarter of 2010 (when Questcor established the MS 'acute exacerbation' fund) and the third quarter of 2013."); id. ¶ 104 ("Mallinckrodt's co-pay subsidies were one way to prop up demand and receive payment from third-party payors such as Humana."); id. ¶ 105 ("In the several decades prior [to 2014], Acthar had not been prescribed in large quantities for these conditions [rheumatology, pulmonology, ophthalmology, dermatology, and kidney disease] despite having been FDA approved for such treatments."); id. ¶ 108 ("In order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not called for and in lieu of considerably more cost-effective medications."); id. ¶ 147 ("Mallinckrodt subsidized co-pays through CDF, and paid the Prescribing Doctors, in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment.").

Perhaps acknowledging the weakness in its product market definition, Plaintiff asserts that it can alternatively show direct proof of market power.  Opp'n at 6.  However, Plaintiff's allegations on this point also fail.  "Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices."  Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997), aff'd, 525 U.S. 299 (1999), and overruled on other grounds by Lacey v. Maricopa Cty., 693 F.3d 896 (9th Cir. 2012).  Plaintiff has certainly alleged that Defendant charges supracompetitive prices.  FAC ¶¶ 2-3, 8, 47, 51-53, 58.  But, it fails to allege Defendant restricted output.  Forsyth, 114 F.3d at 1476 (plaintiffs "failed to present direct evidence of market power" where they "submitted evidence that [defendant] routinely charged higher

prices than other hospitals while reaping high profits" but failed to make a "showing of restricted output"); cf. Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995) (the existence of a price differential or prices that are not closely correlated is insufficient, by itself, to exclude products from a market). To the contrary, Plaintiff has alleged that "the number of Medicare Part D claims for Acthar has grown by more than 700% from 2011 to 2016." FAC ¶ 55.

Because the Court finds Plaintiff has failed to allege a facially sustainable product market definition, or sufficiently allege direct proof of market power, the Court does not address Defendant's arguments about antitrust injury.

The First through Third Counts are DISMISSED with leave to amend.

## B.   RICO (Counts Four and Five)

To state a RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). "[T]he conduct must be (5) the proximate cause of harm to the victim." Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014). Racketeering activity "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096 (2016). There is a pattern of racketeering activity where there is "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." Id. at 2096-97. "[F]ailure to adequately plead a substantive violation of RICO precludes a claim for conspiracy." Howard v. Am. Online Inc., 208 F.3d 741, 751 (9th Cir. 2000).

Plaintiff alleges the "Acthar Enterprise," consisting of Defendant, Express Scripts (and its subsidiaries), CDF, and the prescribing doctors, was "used as a tool to effectuate a pattern of racketeering activity." FAC ¶ 146. Specifically, Defendant 1) made allegedly false statements, including that Defendant was in compliance with the laws,

which constituted mail and wire fraud, as well as use of interstate facilities to conduct unlawful activity, and 2) subsidized co-pays through CDF and made payments to the prescribing doctors which "violated state commercial bribery statutes." Id. ¶¶ 147-49, 153.

### 1.   Conduct of an Enterprise

Plaintiff alleges that the Acthar Enterprise is an association-in-fact enterprise that was ongoing and functioned as a continuing unit. FAC ¶ 146. "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" Odom, 486 F.3d at 552 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). "To establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" Id. (citing Turkette, 452 U.S. at 583). Defendant only challenges whether Plaintiff sufficiently alleged a common purpose. See Mot. at 20-22.

Plaintiff alleges that "Mallinckrodt designed and coordinated" the Acthar Enterprise for the purpose of "charg[ing] and maintain[ing] inflated prices for Acthar." FAC ¶ 83; see also id. ¶ 147 (Defendant "established the Acthar Enterprise to fraudulently increase its sales of Acthar"). Plaintiff also alleges that "[t]he purpose and effect of the conspiracy was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct." Id. ¶ 165.[5] Defendant contends

---

[5] In opposition, Plaintiff argues that the Acthar Enterprise acts "for the common purpose of defrauding payors for their own financial benefit." Opp'n at 11 (citing FAC ¶ 146). That paragraph of the FAC states only that "[t]he Acthar Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity," it does not state a common purpose of defrauding payors for their own financial benefit. Nevertheless, that asserted common purpose is apparent from the allegations in the FAC, even if not alleged in those exact words.

that Plaintiff has not pleaded "any facts plausibly suggesting that" anyone other than Defendant "shared such purposes," and to the contrary Plaintiff alleged that CuraScript received a "fixed fee for each vial of Acthar" and therefore would not have an incentive to raise Acthar's price.  Mot. at 20.  Defendant's argument is not convincing.

Plaintiff has plausibly alleged the conduct of an enterprise based on Ninth Circuit law as set out in Odom and River City Markets, Inc. v. Fleming Foods W., Inc., 960 F.2d 1458 (9th Cir. 1992).  In Odom, plaintiff brought RICO claims against Microsoft and Best Buy based on an agreement between them where Microsoft invested in, and promoted, Best Buy and Best Buy promoted Microsoft's MSN internet access service and other Microsoft products.  486 F.3d at 543.  Plaintiff alleged that when a customer purchased a laptop or phone from Best Buy, Best Buy would provide the customer with an MSN trial CD and would pass the customer's credit card information to Microsoft, which would bill the person for MSN if he did not cancel the trial.  Id.  The Ninth Circuit held that the complaint sufficiently alleged a common purpose of "increasing the number of people using [MSN], and doing do by fraudulent means."  Id. at 552.  Similarly here, Plaintiff has alleged a common purpose of increasing the number of people using Acthar, and doing so by fraudulent means, including allegedly illegal bribes and co-pay subsidies.  Further, the Ninth Circuit in Odom found there was still a common purpose even though Best Buy did not directly benefit from the improper billing for MSN—there were no allegations that Best Buy received a kickback.  Here, while the CDF may not directly receive a kickback from the scheme, the CDF presumably benefits indirectly through Defendant's donations and referrals, which are alleged to be tied directly to Defendant's need to "confirm the amount of future payments to CDF necessary to keep paying Acthar co-pay subsidies smoothly."  FAC ¶ 98.

In River City, plaintiffs brought RICO claims against a grocery store chain for engaging in "a fraudulent scheme to unload unprofitable properties on unsuspecting purchasers."  960 F.2d at 1459.  Plaintiffs had alleged that the defendants "jointly induced the plaintiffs to purchase certain [grocery] stores" and then one defendant (Alpha Beta)

15

"destroyed the business value of the stores" between "the acceptance of plaintiffs' bids and the transfer of the stores." <u>Id.</u> at 1460. The Ninth Circuit found these allegations sufficient to survive a motion to dismiss. <u>Id.</u> However, the Circuit also considered whether the plaintiffs' claims could survive summary judgment and found they could not. <u>Id.</u> at 1463. There was simply no evidence that "the agreement . . . would, if carried out according to its terms, violate any federally protected rights of the plaintiffs" or any "evidence of any contemplated overreaching, deceit, nondisclosure, manipulation of inventory, or any other unethical conduct." <u>Id.</u> at 1463. While there was evidence of Alpha Beta's wrongdoing, there was a lack of evidence as to the other defendant, Fleming. <u>Id.</u> at 1464. The evidence showed that, at most, Fleming knew about Alpha Beta's alleged wrongdoing for no more than a month—an insufficient length of time to establish a pattern of racketeering activity. <u>Id.</u> The Ninth Circuit did not address the "conduct of the enterprise" element in its summary judgment discussion. Regardless, here, unlike in <u>River City</u>, Plaintiff alleges facts supporting that at least CDF and the allegedly bribed doctors were aware of the allegedly fraudulent scheme. <u>See</u> FAC ¶¶ 89, 91, 98, 108, 147, 151.

Defendant contends that "numerous district courts in the Ninth Circuit have dismissed RICO claims that are, like those asserted by Humana here, based on (a) alleged associations in fact among entities with business relationships, and (b) alleged racketeering activity advancing only the particular interests of one member of the alleged associations." Mot. at 20 & n.9. However, the cases cited by Defendant are distinguishable. For example, in <u>Woodell v. Expedia Inc.</u>, No. C19-0051JLR, 2019 WL 3287896 (W.D. Wash. July 22, 2019), plaintiff alleged that Expedia (and its subsidiaries) and Reservations.com had the common purpose of "obtaining tax overpayments from consumers." <u>Id.</u> at *7. However, the Court found that while the complaint alleged Expedia improperly charged "Taxes & Fees" that covered more than money owed to the government on Reservations.com's website, there were "no specific factual allegations that any other Defendant acted with an objective unrelated to ordinary business aims." <u>Id.</u> To the

contrary, the plaintiff had conceded that Reservations.com was "not involved in the collection of the . . . charge at issue . . . or the remission process," and had not alleged "any communication, meeting, agreement, or moment in time when Defendants and Reservations.com agreed to coordinate regarding representations about the 'Taxes & Fees' charge that appears on the Reservations.com website." Id. at *2, *3. The only allegation tying Reservations.com to the alleged conduct of the enterprise was that, on information and belief, Reservations.com was a knowing and willing participant. Id. at *2. Here, there is more than a conclusory allegation as to the other parties' involvement in, and knowledge of, the alleged fraud. There are specific allegations that CDF and the prescribing doctors acted in ways unrelated to ordinary business aims. As Plaintiff points out, CDF knowingly established co-pay subsidy funds outside of its normal programs solely funded by Defendant and solely used to pay patients who are prescribed Defendant's drug, and the doctors accepted bribes. Opp'n at 12.[6]

---

[6] In each of the other cases, the other alleged members of the enterprise were unaware of the defendant's (or other alleged enterprise member's) fraudulent activity. See, e.g., Gomez v. Guthy-Renker, LLC, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *2, *5, *11 (C.D. Cal. July 13, 2015) (dismissing RICO claim for failing to adequately allege an enterprise between an allegedly fraudulent sales business and the payment processors and customer service companies the business utilized, where there was no evidence that anyone other than defendant was aware of the alleged fraud); Hilton v. Apple Inc., No. CV 13-7674 GAF (AJWx), 2014 WL 12597143, at *8 (C.D. Cal. Jan. 9, 2014) (dismissing RICO claim for failing to adequately allege an enterprise between Apple and AT&T where plaintiff alleged nothing more than "a garden variety, run-of-the-mill business relationship, along with Apple's allegedly undisclosed decision to commit fraud."); Missaghi v. Apple Inc., No. CV 13-02003 GAF (AJWx), 2013 WL 12200086, at *7 (C.D. Cal. Nov. 1, 2013) (same); In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) (dismissing a claim under the Ohio Corrupt Activities Act (Ohio's RICO analogue) for failing to allege an enterprise between the defendant and third parties who provided the defendant with services where plaintiff pleaded no facts that the purpose of those business relationships was to profit illegally); In re Jamster

Defendant also cites <u>United Food & Commercial Workers Unions</u> <u>& Employers Midwest Health Benefits Fund v. Walgreen Co.</u>, 719 F.3d 849 (7th Cir. 2013).  Plaintiff contends that this case "improperly narrows Ninth Circuit law" and therefore the standard set in that case "does not apply.  <u>See</u> Opp'n at 12.  Even if the Court were to follow <u>Walgreen</u>, it is distinguishable from this case.  In <u>Walgreen</u>, the Seventh Circuit held that conduct of an enterprise had not been sufficiently alleged where the complaint did not include allegations that "officials from either company involved themselves in the affairs of the other" or that "profits from the illegal drug-switching scheme were siphoned off to the . . . enterprise or to individual enterprise members." 719 F.3d at 854-55.  The complaint had alleged only that the drug manufacturer and the pharmacy communicated, and that the pharmacy implemented an "illegal dosage-form-switching program using [the drug manufacturer's] pills."  <u>Id.</u> at 854.  However, the Seventh Circuit noted that "[a] corporation, after all, is perfectly capable of breaking the law on its own behalf.  The complaint describes conduct that might plausibly state a claim for fraud (among other things) against either defendant, but RICO does not penalize parallel, uncoordinated fraud."  <u>Id.</u> at 855.

Here, as for the doctors, the alleged bribes clearly fall outside of a legitimate commercial relationship.  <u>See id.</u> at 855 (That the pharmacy "purchased its generic [drugs] from [the manufacturer] . . . shows only that the defendants had a commercial relationship").  And unlike in <u>Walgreen</u>, Plaintiff has alleged that Defendant was very involved in the operations of CDF.  For example, Plaintiff alleges that "[t]hough CDF already had a fund for MS patients . . . Questcor and CDF established a

---

<u>Mktg. Litig.</u>, No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5-*7 (S.D. Cal. May 22, 2009) (dismissing RICO claim for failing to allege an enterprise between wireless providers and companies that sell ring tones and wallpapers (content providers), where the wireless providers made money from content sales, but there were no allegations that the wireless provides were in any way involved in the content providers' allegedly deceptive advertising).

new 'MS Acute Exacerbation Fund" just for patients with government insurance . . . and just for the co-pays of Acthar but no other drugs," funded entirely by Defendant.  FAC ¶¶ 88-89.  In addition, Plaintiff alleged that Questcor "sent patients to CDF through Questcor's 'reimbursement hub' for Acthar," called the ASAP program, and that "[t]he ASAP program referred over 98 percent of the patients who received co-pay subsidies from the . . . funds at CDF.  Id. ¶¶ 90, 93.  CDF was also involved in the operations of Defendant in that it established three funds at Defendant's direction to subsidize co-pays for Defendant's drug, and provided "detailed financial reports" to Defendant "containing information about how many patients were enrolled in the fund, how much the fund had already paid out, and how much had been allocated to enrolled patients," as well as "the percentage of patients approved to receive co-pay subsidies, the average co-pay amount paid by the fund, the total number of resulting drug 'dispenses' (broken out by new dispenses vs. refills), and the remaining fund balance."  Id. ¶¶ 88-92, 98.

Plaintiff has sufficiently alleged conduct of the Acthar Enterprise.

### 2.  Pattern of Racketeering Activity

#### a.  Mail and Wire Fraud

"The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud."  Eclectic Properties, 751 F.3d at 997 (citing Schreiber, 806 F.2d at 1400).

Where RICO predicates are fraud based, allegations must comply with Federal Rule of Civil Procedure 9(b), which requires that circumstances constituting fraud be stated with particularity.  Alan Neuman Prods., Inc. v. Albright, 862 F.2d 1388, 1392 (9th Cir. 1988) (Where RICO claim is based on mail and wire fraud, Rule 9(b) "requires that circumstances constituting fraud be stated with particularity"; complaint is fatally flawed when "[t]he allegations of predicate acts in

the complaint concerning those elements of RICO are entirely general; no specifics of time, place, or nature of the alleged communications are pleaded.").  However, "[t]he only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself."  Odom, 486 F.3d at 554.  Because "the formation of a scheme or artifice to defraud" and the "specific intent to deceive or defraud" require "a showing of the defendants' state of mind, general rather than particularized allegations are sufficient."  Id.

**Compliance with State and Federal Law.**  Plaintiff alleges that Defendant "directly misrepresented to [Plaintiff] that it was complying with state and federal law, including laws related to bribery, kickbacks, and false claims" when Defendant (and CuraScript) submitted data for Prescription Drug Event (PDE) claims "certifying that such data is true, accurate, and complete."  FAC ¶¶ 111-116.  Defendant notes that Plaintiff "does not allege that [Defendant] denied to [Plaintiff] that they had made contributions to CDF's co-pay assistance funds, nor misrepresented to [Plaintiff] the details of those funds,"[7] but allegedly misrepresented that they were complying with the law because the co-pay assistance programs violated federal statutes, including the Anti-Kickback Statute (AKS) and the False Claims Act (FCA).  Mot. at 13.

First, Defendant asserts in conclusory fashion that "[t]his allegation lacks sufficient particularity to satisfy Rule 9(b)."  Mot at 13.  Plaintiff has alleged that each time Defendant certified that it was in compliance with federal and state laws, it knowingly made a false

---

[7] The Court notes that the FAC could be read to make such a claim.  See FAC ¶ 89 ("Questcor's donation agreement [for the MS Fund] falsely represented that the funds were generally for treatment of patients with acute exacerbations of MS, when in fact Questcor knew it was just for patients using Acthar."), ¶ 91 (The Lupus Fund agreement "falsely stated that the fund was for 'any medically appropriate therapy,' when in fact Questcor intended to fund only Acthar and exclude other therapies.").  However, Plaintiff does not allege that it actually saw the donation agreements at any point in time.

statement because it knew at the time it made the statements that its co-pay assistance violated federal statutes and its doctor payments violated state law.  This is sufficient.

Next, Defendant contends that Plaintiff has failed to allege fraudulent intent because "the OIG had issued guidance expressly endorsing patient assistance programs for Medicare Part D enrollees, including pharmaceutical manufacturer funding of such programs." Mot. at 13.[8]  However, this misstates the Court's inquiry on a motion to dismiss.  It need not determine whether Defendant in fact had a fraudulent intent.  Rather, it must only determine whether Plaintiff has plausibly alleged a fraudulent intent with general allegations. Plaintiff has done so.  See FAC ¶¶ 101 ("The Company's knowledge and willfulness is evidenced by internal training materials that instructed its employees on these laws and their relevant prohibitions; corporate policies reflecting the Company's knowledge of its illegality; trade publications and articles circulated among the key executives and consultants warning against the practice; and longstanding and repeated warnings about the practice from the Office of the Inspector General of the United States Department of Health and Human Services."), 147 (Defendant "established the Acthar Enterprise to fraudulently increase its sales of Acthar" by making payments "in exchange for an increased rate of prescriptions of Acthar in lieu of less expensive alternative treatment" and "Mallinckrodt, CDF, and the Prescribing Doctors knew that their scheme violated federal and state laws.").

Even were the Court to consider the 2005 OIG SAB, that guidance does not support Defendant's position that it could not have acted with fraudulent intent "as a matter of law" because it "had a good-faith basis to certify compliance in light of OIG guidance that

---

[8] Pursuant to Federal Rule of Evidence 201(b), the Court GRANTS Defendant's unopposed request for judicial notice (RJN) of the 2005 and 2014 OIG Special Advisory Bulletins.  Dkt. 48 (RJN), Exs. A (2005 SAB), K (2014 SAB).

continued in effect until 2014."  Reply at 5; <u>see also</u> Mot. at 15 ("[T]he OIG's guidance indisputably establishes a good faith basis for a general representation of compliance with law").  Specifically, the 2005 SAB provides that "pharmaceutical manufacturer PAPs [patient assistance programs] that subsidize Part D cost-sharing amounts present heightened risks under the antikickback statute," but "cost-sharing subsidies provided by bona fide, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions."  RJN, Ex. A at 8.  However, the OIG "would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer . . . to be a bona fide, independent charity, because . . . the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products."  <u>Id.</u> at 8 n.3.  Similarly, the 2005 SAB notes that subsidies provided by a drug manufacturer for the manufacturer's product "would implicate the antikickback statute and pose a substantial risk of program and patient fraud and abuse" and "would be squarely prohibited by the statute."  <u>Id.</u> at 9.  Here, Plaintiff alleges that the CDF funds at issue were "exacerbation funds" for diseases that the CDF's other funds already covered, that these funds received all of their funding from Defendant and provided subsidies only for Acthar, and that the CDF provided data to Acthar about the subsidies that were paid.  FAC ¶¶ 88-98; <u>see also</u> Opp'n at 15.  Therefore, the Court rejects Defendant's contention.  Accepting the FAC's allegations as true, it is more than plausible that Defendant acted with fraudulent intent in certifying that the co-pay assistance funds complied with federal law.[9]

---

[9] That the 2014 SAB was purportedly stricter does not change the import of the clear language in the 2005 SAB.  Neither does the Court find the OIG advisory opinions, RJN, Exs. B-I, J, were it appropriate to consider them, convincing.  <u>See</u> <u>United States ex rel. Strunck v. Mallinckrodt Ard LLC</u>, No. CV 12-175, 2020 WL 362717, at *6 (E.D. Pa. Jan. 22, 2020) (denying Mallinckrodt's motion to dismiss based on similar arguments, specifically rejecting proposed implication from footnote in OIG guidance and advisory

Third, Defendant argues that any racketeering acts related to the co-pay assistance funds occurred outside the four-year statute of limitations.[10]  Mot. at 16.  Plaintiff alleges that Defendant "marketed guaranteed co-pay assistance to physicians and patients . . . throughout the relevant time period," that "through 2014, the Lupus Exacerbation fund paid the co-pays of Acthar but no other drug," and that "[o]n information and belief, Mallinckrodt continued to pay or substantially subsidize required patient co-payments for Acthar after 2014 and continues to do so until today."  FAC ¶¶ 91, 95, 102 (citing Defendant's website).  Plaintiff further alleges that it "could not have discovered and remained unaware of the foregoing conduct until the Federal Trade Commission and the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements."  Id. ¶ 123.

The Ninth Circuit "follow[s] the 'injury discovery' statute of limitations rule for civil RICO claims."  Pincay v. Andrews, 238 F.3d 1106, 1109 (9th Cir. 2001).  In other words, the statute begins running when plaintiff has either actual or constructive notice.  Id.  Defendant argues that Plaintiff "had constructive notice of its injury when patients used the program to meet a co-pay for a prescription that Humana covered" because of "the publicized nature of the co-pay assistance program."  Mot. at 16 n.5.  It is not alleged in the FAC that Plaintiff was in any way notified whether co-pays were subsidized by

_____

opinion that there are "rare circumstances" where there may be only one drug covered by Medicare for a particular disease).  Importantly, as Plaintiff notes, Opp'n at 15-16, MS, RA, and Lupus, the conditions for which Defendant established co-pay funds, have other drugs that are the "first-line" treatment and therefore the "rare circumstance" where only one drug is approved for certain diseases does not apply in any event.

[10] Defendant's related argument that Plaintiff "makes no factual allegations that the challenged conduct continued after the OIG revised its guidance regarding patient assistance programs in 2014," Mot. at 16, is not relevant to resolution of this motion for the reasons discussed in the preceding paragraph.

assistance funds.  In fact, Plaintiff's allegations about its members indicate otherwise.  See FAC ¶ 120 ("Humana members are required to pay what they owe for drug coverage under Medicare Part D and other kinds of plans . . . .  Through its illegal scheme to pay patient co-pays through phony charitable funds at CDF, Mallinckrodt caused Humana members to unintentionally misrepresent that they had paid their contractual share of prescription drug coverage").  The mere receipt or payment of claims, when there is "no reason to think that Plaintiff knew those [claims] were fraudulent or excessive when it paid them," does not establish constructive knowledge of Plaintiff's injury.  State Comp. Ins. Fund v. Capen, No. SACV 15-1279 AG (CWx), 2015 WL 13298073, at *5 (C.D. Cal. Dec. 18, 2015).

Nor is there anything in the FAC that indicates the allegedly illegal aspects of Defendant's co-pay assistance program were widely publicized, or that the information to be gleaned from the purported publicity could be imputed to Plaintiff.  See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 365 (9th Cir. 2005) ("[T]he district court erred in determining that, as a matter of law, the attention received by [a sanction order against defendants] could be imputed to the Plaintiffs").  Although the FAC alleges that Defendant "marketed guaranteed co-pay assistance to *physicians and patients* as a way to neutralize concerns about the price and to induce sales and Medicare reimbursement," FAC ¶ 95 (emphasis added), nothing in the FAC supports the conclusion that this marketing put the doctors or patients on notice of the allegedly illegal aspects of those funds, or that insurance providers (who were not recipients on this advertising) would somehow know about the illegal aspects.  For example, there is no allegation to support the fact that it was publicized that Defendant was even a donor to those funds, let alone the exclusive owner that referred nearly 100% of the patients to the fund or that the funds only covered Acthar.  Further, Plaintiff has alleged that the donation agreements fraudulently misrepresented that the funds were not limited to patients using Acthar.  FAC ¶¶ 89, 91.  Therefore, had Plaintiff inquired into the funds, it would not have discovered that the funds were illegal.  Cf. Living Designs, 431 F.3d at 365 (plaintiff has constructive notice where

"an investigation which, if reasonably diligent, would have led to discovery of the fraud").

Therefore, Plaintiff's allegation that it did not, and could not have, discovered its injury until the "United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements," FAC ¶ 123, is plausible. Because the DOJ press release announcing it filed a complaint against Defendant for its conduct related to the co-pay assistance funds was published on June 5, 2019,[11] Plaintiff brought these claims well within the four-year limitations period.[12]

Finally, Defendant contends that because the AKS and FCA are not predicate acts, wire fraud and mail fraud based on alleged violations of those statutes should not result in RICO liability. Mot. at 16. However, unlike the cases cited by Defendant,[13] it is not the

---

[11] The Court takes judicial notice of the date of the DOJ press release available at https://www.justice.gov/opa/pr/united-states-intervenes-false-claims-act-lawsuit-against-drug-maker-mallinckrodt-alleging. Fed. R. Evid, 201(b); Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010) (The Court may "take judicial notice of [] information . . . made publicly available by government entities" whose accuracy is not disputed by the parties."); Taleff v. Sw. Airlines Co., 554 F. App'x 598, 599 (9th Cir. 2014) (taking judicial notice of a Department of Justice press release).

[12] The Court therefore need not address the issue of fraudulent concealment.

[13] See Ayres v. Gen. Motors Corp., 234 F.3d 514, 521 (11th Cir. 2000) ("Plaintiffs have identified no affirmative misrepresentation on the part of the Defendants" and rely solely on a duty to disclose under the National Traffic and Motor Vehicle Safety Act); Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1229 (D.C. Cir. 1991) (Plaintiff alleged only that Defendant violated the Service Contract Act, but a violation of that act "fall[s] short" of a "scheme or artifice to defraud"); Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 636 (2d Cir. 1989) (RICO allegations that defendant retaliated against plaintiff was essentially a whistleblower complaint that must be brought before the Secretary of Labor); Butchers' Union, Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.,

violation of the AKS or the FCA itself that is alleged to form the basis for the wire and mail fraud, but the false certifications to Plaintiff about compliance with those statutes.  See Opp'n at 17.

**Doctor Misrepresentations.**  Plaintiff alleges that when the doctors who prescribed Acthar got prior authorization from Plaintiff, they falsely represented that "the prescription medication is medically necessary, up-to-date, and non-duplicative" and "that they are not violating state or federal law applicable to the provision of their services" because they had accepted money in exchange for those prescriptions."  FAC ¶¶ 117-118.  Defendant does not address this type of misrepresentation separately.  However, for the reasons stated above, Plaintiff has sufficiently alleged that such statements are predicate RICO acts of the Acthar Enterprise.

**Insured Misrepresentations.**  Plaintiff also alleges that Defendant caused patients to "unintentionally misrepresent that they had paid their contractual share of prescription drug coverage" when in fact their co-pays were paid by "phony charitable funds at CDF."  FAC ¶ 120.  However, Plaintiff has failed to allege how a representation by patients that they paid their co-pays is rendered false merely because they received the funding from a co-pay assistance program.  The 2005 SAB specifically contemplates this scenario.  RJN, Ex. A at 9 ("[C]ost-sharing assistance furnished by a PAP, including a manufacturer PAP, will count toward a beneficiary's [true out-of-pocket] expenditures, even if the PAP does not comply with the fraud and abuse laws.").

---

631 F. Supp. 1001, 1010 (E.D. Cal. 1986) (any claim that is "arguably within the [Labor] Board's jurisdiction . . . is preempted" and therefore any RICO claim based on conduct that "otherwise falls within the exclusive jurisdiction [of] the NLRB" will be preempted); see also Bodimetric Health Servs., Inc. v. Aetna Life & Cas., 903 F.2d 480, 488 n.7 (7th Cir. 1990) (plaintiff had withdrawn the civil RICO count for jurisdictional purposes).

Therefore, Plaintiff has failed to plead mail or wire fraud based on this conduct.

      b.    <u>Bribery</u>

**<u>Co-pay Assistance.</u>**  Defendant contends that co-pay assistance is not a bribe under the relevant state laws because it was not given to 1) an "employee to induce the employee to use his or her employment for the benefit of the person," or 2) a physician to induce a breach of the physician's duty to a patient."  Mot. at 12 n.4 (citing the California and Alaska bribery statutes as examples).  Plaintiff contends that bribery also applies to "the acceptance of 'compensation or inducement' for referral of patients . . . by those processing or presenting insurance claims."  Opp'n at 17 (citing Cal. Ins. Code § 750).

The Travel Act prohibits, among other things, use of interstate commerce to conduct "unlawful activity."  Unlawful activity includes "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b)(2).  The Supreme Court has interpreted "bribery" in this statute to mean "the generic definition of bribery, rather than a narrow common-law definition."  <u>Perrin v. United States</u>, 444 U.S. 37, 49 (1979).  Therefore, "the Travel Act [] encompass[es] conduct in violation of state commercial bribery statutes."  <u>Id.</u> at 50.  Other courts in this district have interpreted this to include statutes prohibiting bribery-like conduct, whether or not the statute is identified as a bribery statute.  <u>See, e.g.</u>, <u>United States v. Rogers</u>, 389 F. Supp. 3d 774, 787 (C.D. Cal. 2019) (California Insurance Code Section 750 prohibits bribery, as that term is used in the Travel Act); <u>United States v. Gross</u>, 370 F. Supp. 3d 1139, 1149 (C.D. Cal. 2019) (same); <u>cf. United States v. Nardello</u>, 393 U.S. 286, 295 (1969) ("[T]he inquiry [under the Travel Act] is not the manner in which States classify their criminal prohibitions but whether the particular State involved prohibits the extortionate activity charged.").  This Court finds the analysis in those cases to be convincing.  A violation of California Insurance Code Section 750 constitutes bribery under the Travel Act.

However, the FAC fails to allege how Section 750 was violated. That statute prohibits "any person . . . who engages in the practice of processing, presenting, or negotiating claims, including claims under policies of insurance" from "offer[ing], deliver[ing], receiv[ing], or accept[ing] any . . . consideration . . . as compensation or inducement to or from any person for the referral or procurement of clients, cases, patients, or customers." Cal. Ins. Code § 750(a). Plaintiff does not allege which relevant party purportedly "engages in the practice of" presenting insurance claims and accepted money in exchange for the referral of patients. The only parties that receive consideration as part of the co-pay funds are CDF and the patients. Plaintiff does not allege that CDF engages in the practice of presenting insurance claims, nor is it clear that this statute applies to patients themselves. Therefore, Plaintiff has not sufficiently alleged that the co-pay assistance funds constituted bribery.

**Bribes to Doctors.** Defendant also contends that Plaintiff has failed to allege more than "conclusory contentions" showing the payments to doctors were for an unlawful, rather than lawful, purpose. See Mot. at 17-19. The Court disagrees. Plaintiff's allegations go beyond the evidence of correlation identified in the journal article in paragraph 106 of the FAC. Plaintiff also alleges that 1) in 2007, Defendant "knew that it might have priced itself out of the MS market," 2) Defendant "heavily marketed" Acthar to doctors who treated conditions such as MS, rheumatoid arthritis, and sarcoidosis, 3) "Acthar had not been prescribed in large quantities for these conditions" prior to 2014, 4) in 2014, the president of the business selling Acthar told investors about "a strategy to expand Acthar's sales to patients" with these and other conditions even though "there were no new medical studies suggesting Acthar was needed to treat any of these conditions," 5) today, "fewer than 10% of Acthar's sales come from prescriptions for infantile spasms," and 6) 88% of doctors who submitted more than 10 Medicare claims for Acthar received payment from Defendant, while only 35% of all specialists "receive payments from the pharmaceutical industry." FAC ¶¶ 94, 104-06. In addition, eight of the nine doctors who prescribed the most Acthar to Plaintiff's

members are rheumatologists or neurologists, and one specializes in sarcoidosis: all specialties that treat conditions for which Plaintiff has extensively alleged there are cheaper and more effective treatment options.  See, e.g., id. ¶¶ 6, 13, 45-49, 84, 108.[14]  Taken together, these allegations plausibly suggest the payments to doctors were in exchange for prescribing Acthar, and not some other lawful purpose.  See Eclectic Properties, 751 F.3d at 996 (quoting Starr, 652 F.3d at 1216) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible.").[15]

Although Plaintiff has not succeeded in each of its arguments, it has sufficiently alleged a pattern of racketeering activity.

### 3.    Proximate Harm

Plaintiff alleges that the "effect of Mallinckrodt's racketeering activity was to induce sales of Acthar that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of Acthar to a higher level than it would have commanded in the absence of the illegal conduct" and Plaintiff "suffered injuries when it reimbursed those prescriptions for Acthar that otherwise would not

---

[14] Plaintiff cites a case noting that "compensation that exceeds fair market value is smoke . . . that makes fire plausible."  Opp'n at 19 (alterations omitted) (internal quotation marks omitted).  However, Plaintiff does not allege the doctors were paid above fair market value.

[15] Defendant moves to strike paragraph 109 of the FAC, which refers to a settlement between Defendant and the Department of Justice regarding illegal kickbacks.  Mot. at 3, 10, 18.  Defendant correctly notes that "the settlement is not proof that the underlying allegations were true," Mot. at 3, but the allegation that Defendant reached a settlement is not "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The motion to strike is DENIED.

have been made and/or paid the higher prices that resulted from the illegal conduct."  FAC ¶¶ 154-55.

Defendant argues that this is insufficient because Plaintiff "does not contend that the alleged misconduct resulted in any Acthar prescriptions that were inappropriate given the patient's particular condition" nor any Acthar prescriptions that were "harmful or ineffective."  Mot. at 23.  As a factual matter, this is simply not correct.  See, e.g., FAC ¶¶ 6 ("But other than [infantile spasms] and a handful of similarly rare conditions, Acthar is . . . either a drug of last resort or not known to be clinically effective"), 13 (Without the bribery scheme, "doctors would not otherwise be inclined to prescribe what for most purposes is an antiquated and expensive drug that requires refrigeration and injection when cheaper, more effective pills and remedies were available"), 46 ("there remains a lack of evidence to support the use of Acthar for most indications"), 49 ("it was expensive to produce, difficult to apply, and (except for certain indications such as infantile spasms) not known to be more effective than simpler, cheaper, and more widely available drugs"), 108 (Defendant "knew that in order to increase the prescription rates of Acthar, the Prescribing Doctors would need to prescribe Acthar in situations in which it was not called for and in lieu of considerably more cost-effective medications"), 128 ("[B]ut for Mallinckrodt's kickback scheme and illegal co-pay assistance through CDF, prescription rates for Acthar would have been lower, and Humana members would have received different care from their physicians that was more effective, less harmful, or more cost effective than doses of Acthar").

And as a legal matter, Defendant has not shown why this is relevant.  Plaintiff's "damages do not depend on the effectiveness of the" Acthar that Plaintiff paid for, but rather on "the inflationary effect that [Defendant's] allegedly fraudulent behavior had on the price of [Acthar]."  In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.,

804 F.3d 633, 640 (3d Cir. 2015).[16]  Defendant's reliance on
Ironworkers Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352
(11th Cir. 2011) is misplaced.  In Ironworkers, the alleged false
representation was "concerning the drug's safety and efficacy in that
use."  Id. at 1363.  The Eleventh Circuit held that a plaintiff must
allege that the misrepresentation about the drug's safety and efficacy
affected the doctor's prescription decision.  Without any direct evidence,
the court posited that "a plaintiff must allege that she not only paid for
the drug, but also that its prescription was medically unnecessary or
inappropriate."  Id.  Here, Plaintiff explicitly alleges that the doctors,
who were themselves allegedly making false representations, would not
have prescribed Acthar absent the allegedly illegal conduct.  Therefore,
allegations of indirect evidence are unnecessary.[17]

Defendant cites Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258
(1992), which opines that "the less direct an injury is, the more difficult
it becomes to ascertain the amount of a plaintiff's damages attributable
to the violation, as distinct from other, independent, factors."  Id. at
269.  But Holmes does not stand for the proposition that proximate
harm cannot be established any time it is difficult to ascertain
damages.  Rather, as the Ninth Circuit recently noted, this is one of the
"three practical factors" that describe the "direct relation" requirement
for proximate cause.  Painters, 943 F.3d at 1249.  Under this first

---

[16] The Ninth Circuit cited Avandia with approval in Painters & Allied Trades
Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd., 943 F.3d 1243,
1257 (9th Cir. 2019).

[17] To the extent Ironworkers can be interpreted to eliminate insurance
companies' ability to bring lawsuits against drug manufacturers for fraud,
see 634 F.3d at 1360, 1364, this Court, along with the Third Circuit and other
courts in this district, see Opp'n at 21 (citing Avandia, 804 F.3d at 641 n.45
and In re Lidoderm Antitrust Litig., 2017 WL 679367, at *22 n.32 (N.D. Cal.
Feb. 21, 2017)), respectfully disagrees.  Further, unlike in Ironworkers where
the plaintiff potentially could have uncovered the alleged fraud through
preauthorization, Plaintiff here already required preauthorization but alleges
the doctors made false representations as part of that process.

factor, courts are to determine "whether it would be ***too difficult*** to ascertain what damages are attributable to Defendants' alleged RICO violation, as opposed to factors other than, and independent of, Defendants' alleged misrepresentations." Id. (emphasis added). Further, Defendant has not explained how damages would be too difficult to ascertain merely because some prescriptions may have been medically necessary. To the contrary, Defendant implies it would be quite easy to "review the propriety of each Acthar prescription that [Plaintiff] covered" and determine "its medical necessity." See Mot. at 23.[18]

Defendant also cites United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health & Welfare Fund v. Amgen, Inc., 400 F. App'x 255 (9th Cir. 2010), which held that the plaintiff had "failed to plead a cognizable theory of proximate causation that links [defendant's] alleged misconduct to [plaintiff's] alleged injury." Id. at 257. In Amgen, the plaintiff alleged that defendant drug manufacturer had "concealed adverse test results while promoting [its drugs] for various off-label uses." Id. The Ninth Circuit held that there was an "attenuated causal chain" involving 1) an industry reference guide's inclusion of the drug as treatment for anemia of cancer, 2) Medicare's and third-party payor's decisions to cover the drug for anemia of cancer, and 3) the doctors' decision to prescribe the drug for anemia of cancer. Id. None of those third parties were alleged to have participated in any wrongdoing. In contrast, here the doctors were allegedly bribed to prescribe Acthar and were participants in the RICO conspiracy. That causal link is far from attenuated.[19] Where the doctors are alleged to

---

[18] The other relevant Holmes factor, "whether there are more directly injured victims we can count on to hold Defendants liable" also weighs in favor of proximate causation. Painters, 943 F.3d at 1252. Because of the co-pay assistance, Plaintiff and other insurers are "the most direct victims of those who suffered economic injury." Id.

[19] The other cases cited by Defendant are similarly distinguishable in that the doctors were not alleged to be part of the criminal activity. See UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 134 (2d Cir. 2010) ("the conduct

be a part of the scheme, and to have made false statements themselves, the doctors' prescription decisions do not break the causal chain. Moreover, the Ninth Circuit has now held that even unknowing doctors do not constitute an intervening cause. <u>Painters</u>, 943 F.3d at 1257-58 (to hold "that prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause" would insulate drug manufacturers "from liability for their fraudulent marketing schemes, as they could continuously hide behind prescribing physicians and pharmacy benefit managers," which is "not the purpose the requirement of proximate cause is intended to serve").

Similarly, <u>Health Care Serv. Corp. v. Olivares</u>, No. 2:10-CV-221-TJW-CE, 2011 WL 4591913 (E.D. Tex. Sept. 2, 2011), <u>report and recommendation adopted,</u> No. 2:10-CV-221-DF-CE, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011) is distinguishable because the alleged fraudulent conduct was the marketing of defendant's drugs for off-label use. <u>Id.</u> at *1. The plaintiff failed to allege "that any doctors or other health care professional relied on any . . . misrepresentation promoting an off-label use" or that any misrepresentations "were made directly to it." <u>Id.</u> at *7. The complaint failed even to allege when plaintiff added defendant's drug to its approved list or the "circumstances [under which] those drugs were added." <u>Id.</u> Here, Plaintiff has alleged that the doctors prescribed Acthar because of the bribes and the availability of the co-pay assistance funds, and the false certifications from

---

directly causing the harm was distinct from the conduct giving rise to the fraud" where doctors prescribed defendant's drug because of misinformation about the drug, not bribes, and plaintiff's harm was not based on over-prescription of drugs, but plaintiff's reliance on third parties to place the drug on their list of approved drugs and subsequent failure to negotiate the price of the drug at a lower level); <u>Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.</u>, 873 F.3d 574, 577 (7th Cir. 2017) ("The absence of data leaves a serious problem in showing plausible causation" where the alleged fraud "may not have changed their prescribing practices at all"). Moreover, as Defendant concedes, Reply at 11, their "persuasiveness" has been "call[ed] into question" by <u>Painters</u>.

Defendant and the doctors directly caused Plaintiff to pay for Acthar in an amount and for a price higher than it otherwise would have absent the alleged illegal conduct.  Like in <u>Painters</u>, Plaintiff here is the direct recipient of the false statement.  943 F.3d at 1251 ("Plaintiffs' alleged injury is that they purchased . . . prescriptions for which they would not have paid ***had they been warned*** about [the drug's] risk of bladder cancer." (emphasis added)).

Plaintiff has sufficiently alleged the Acthar Enterprise's conduct proximately caused its injury.

Defendant's motion to dismiss Counts Four and Five is DENIED.

## C.   State Law Claims (Counts Six through Ten)

Defendant contends that because Plaintiff's unfair competition, consumer fraud and deceptive trade practices, insurance fraud, and unjust enrichment claims "rest on the same factual allegations or legal theories" as the antitrust and RICO claims, they should be dismissed for the same reasons as those claims.  Mot. at 25.  Even if this were so, because the Court denies Defendant's motion to dismiss the RICO claims, the state law claims survive as well.  Defendant's motion to dismiss counts six through eight and ten is DENIED.

As to the tortious interference claim, which alleges that Defendant interfered with Plaintiff's contracts with its members by providing co-pay assistance, FAC ¶ 191, Defendant notes that accepting co-pay assistance is not a breach of the insurance agreement that requires members to pay their share of costs for prescription drugs, Mot. at 25.  As noted above, the OIG guidance states that co-pay assistance, even if from an illegal fund, "will count toward a beneficiary's [true out-of-pocket] expenditures."  RJN, Ex. A at 9.  Therefore, Plaintiff has not alleged that its members breached their contract.[20]   Count Ten is DISMISSED with leave to amend.

---

[20] The additional provision identified in Plaintiff's opposition is more convincing.  Opp'n at 24 (contract provision that "specifies that Humana 'will not pay for any share of . . . drug costs' for drugs obtained through a

## IV. CONCLUSION

Counts One through Three and Ten are DISMISSED with leave to amend.[21]  An amended complaint may be filed and served no later than April 10, 2020.  Failure to file by that date will waive the right to do so.  The Court does not grant leave to add new defendants or new claims.  Leave to add new defendants or new claims must be sought by a separate, properly noticed motion.

IT IS SO ORDERED.

Date: March 9, 2020

Dale S. Fischer
United States District Judge

---

manufacturer's 'patient assistance program.'").  However, because this was not included in the FAC, the Court does not consider it at this time.

[21] Although the Court does not dismiss the RICO-based counts, Plaintiff is free to amend those claims consistent with the deficiencies identified in this order.